RICHARD HATCHER ET AL. *v.* MONROE SMITH ET AL.

[No. 671A104. Filed June 8, 1972.]

*Charles A. Ruckman,* of Gary, for appellants.

*Hilbert L. Bradley,* of Gary, for appellees.

STATON, J.—Thirty-three firemen, who were on vacation during a five day firemen's strike in Gary, Indiana, did not receive a week of their vacation pay after the strike had ended. Other firemen, who did not work during the strike, were paid. The thirty-three firemen brought a class action to recover their vacation pay against the Appellants, who shall hereafter be referred to as the "City." The trial court found *inter alia* that the "City" arbitrarily deducted wages from the vacationing firemen and rendered a judgment for $17,437.50. The "City" brings this appeal and contends *inter alia:*

(1)  That the "City's" action was not arbitrary, and
(2)  That the trial court committed error in assessing damages for an excess of the back pay lost by the thirty-three vacationing firemen.

We affirm the trial court's judgment as to the arbitrary action taken by the "City," but reverse the trial court's judgment as to the assessment of damages with instructions in the opinion that follows:

The thirty-three vacationing firemen filed a complaint on June 23, 1970 which alleged *inter alia:*

"That in accordance with the rules and regulations of the BOARD OF PUBLIC WORKS AND SAFETY and Section 2-1236, plaintiffs, and other firemen similarly situated, were granted vacations and sick leave on or about the 30th day of June, 1969.

"That on or about the 5th day of August, 1969, due to a controversy between the firemen and defendants concerning wages and conditions of employment, members of the Gary Fire Department did strike, causing the stations to be locked, fire trucks unmanned, and firefighting discontinued for approximately five (5) days.

"That in violation of the governmental contract of employment, employer-employee relationship, the defendants arbitrarily, unreasonably, and capriciously paid some striking, vacationing or sick leave firemen, whose names are omitted due to numbers, and deducted wages from the plaintiffs for failing to work during the same period."

A pre-trial order dated October 6, 1970 stipulates that the following list of firemen were paid during the strike from August 5, to and including August 10, 1969, pay period ending August 31, 1969:

| | | |
|---|---|---|
| 1. | John LaBroi | $114.20 |
| 2. | Tom Farris | 114.20 |
| 3. | James Rowan | 103.40 |
| 4. | Tom Sourounis | 103.40 |
| 5. | Edwin Nowak | 107.50 |
| 6. | Al Nasiatka | 103.40 |
| 7. | Pete Lewandowski | 103.40 |
| 8. | Novo Martin | |
| 9. | Nick Koss | 103.40 |
| 10. | Alonzo Smith | 117.50 |
| 11. | Richard Landrum | 117.50 |
| 12. | Joe Ferkull | 107.50 |
| 13. | Oscar Rogers | |
| 14. | Leo Piet | 103.40 |
| 15. | Albert Gambel | 103.50 |
| 16. | Pete Sut | 117.50 |
| 17. | Andrew Nemtuda | 107.50 |
| 18. | Fred Lazzaro | 103.40 |
| 19. | Willard Ferhat | 107.50 |
| 20. | Kenneth Callaway | 109.20 |

Mr. Ruckman, attorney for the "City," further stipulated during trial:

"Now, we are, for the purpose of the record, we can stipulate that the salaries were deducted and the Board of Works did not repay any of the firemen involved in this case."

The record does not show that the trial court followed Rule TR. 23(C)(3) of the Indiana Rules of Procedure, which provides:

"The judgment in an action maintained as a class action under subdivision (B)(1) or (B)(2), whether or not favorable to the class, shall include and describe those whom the court finds to be members of the class. The judgment in an action maintained as a class action under subdivision (B)(3), whether or not favorable to the class, shall include and specify or describe those to whom the notice provided in subdivision (C)(2) was directed, and who have not requested exclusion, and whom the court finds to be members of the class."

when the trial court rendered its judgment in the sum of $17,437.50. This omission by the trial court will be discussed in greater detail under the section of this opinion dealing with excessive damages.

In reviewing the sufficiency of the evidence, this court will not weigh the evidence nor resolve questions of credibility of witnesses. We will look only to that evidence and the reasonable inferences therefrom which support the trial court's judgment. *City of Indianapolis* v. *Schmid* (1968), 251 Ind. 147, 240 N. E. 2d 66; *Turner* v. *State* (1972), 258 Ind. 267, 280 N. E. 2d 621; *Wm. J. & M. S. Vesey, Inc.* v. *Hillman* (1972), 151 Ind. App. 388, 280 N. E. 2d 88. If the action of the trial court is sustainable on any theory, it must be affirmed. *Ross* v. *Review Board* (1962), 243 Ind. 61, 182 N. E. 2d 585; *State ex rel. Tittle* v. *Covington Comm. Schools* (1951), 229 Ind. 208, 96 N. E. 2d 334; *Lewis* v. *Burke* (1968), 143 Ind. App. 696, 242 N. E. 2d 382.

The "City" contends that the paying of some members of the fire force while deducting wages of the thirty-three vacationing firemen was not arbitrary, unreasonable and capricious as concluded by the trial court. The evidence and all of the reasonable inferences which may be drawn therefrom most favorable to the thirty-three vacationing firemen and the court's judgment do not support the "City's" contention.

This evidence shows that the thirty-three vacationing firemen were granted vacations prior to the strike. The Gary Fire Department and the Gary Fire Fighters Association, Local 359 went on strike August 5, 1969. Fire Chief, Alphonso Holliday, issued back to work orders and cancelled all vacations. Most of the stations were locked and guarded by police to protect the firefighting equipment and the buildings. Some of the vacationing firemen who received Fire Chief Holliday's notice that vacations were cancelled found policemen guarding their stations and were prevented from entering. Alfred Bono testified that he was unable to enter his station. His testimony is as follows:

"Q. That would have been the 6th?

"A. The 6th. My last working day was on the 3rd on a Sunday. I rode past there and I seen a policeman in the station and he had his car in front of the engine and he had the station locked.

"Q. And did you engage in any conversation with the police officer?

"A. No, I couldn't get in.

"Q. Did you try to get in?

"A. They changed the locks.

"Q. I take it by that you did not have a key to the door, is that it?

"A. I had a key for a previous lock, but I think they changed them."

Captain Nelson Bliss testified:

"Q. Did you receive a call from the Chief or anyone else from the Gary Fire Department to return to the job?

"A. No, I did not. I received, rather my son received a call on August 7, in the afternoon, nine- (9) year old boy at home, said some Chief had called from the fire station. I was working at Highland at the time. That night I got out about 7:30; I called the Chief.

"Q. What, if anything, did the station say?

"A. The Chief, Holliday, told me all vacations had been cancelled.

"Q. And what, if anything, then did you do after the Chief told you it had been cancelled.

"A. I went to the union hall at 5th and Massachusetts.

"Q. Did you go back to the job?

"A. I went back to the job Friday morning.

"Q. What, if anything, happened?

"A. I arrived at No. 9 on Clark Road at 6:50 a.m. in the morning, stopped at the door of the kitchen by a Gary police officer.

"Q. Did you know the police officer?

"A. No, I did not.

"Q. Did you engage in any conversation?

"A. None whatsoever. He said the Fire Department was on strike and we couldn't enter the station.

"Q. This is what the police said?

"A. This is what he said."

George Droza testified:

"Q. Now, pursuant to the 5th day of August, of 1969, did you receive a call to go back to Station No. 3 to report to work?

"A. I didn't receive a call. My wife did. She relayed the message to me.

"Q. What, if anything, did you receive after you received this call?

"A. The following morning I reported to No. 3 Fire Station.

"Q. What, if anything, happened?

"A. Well, there was a uniformed policeman there. There was a vehicle parked in front of the door and I was told no one was admitted into the station.

"Q. How were you dressed?

"A. I was in firemen's blue working uniform.

"Q. You don't know whether it was the 6th or 7th?

"A. It was the day after I received the call, yes."

A twenty-three year policy of the Department had been that no fireman on vacation was subject to recall during an emergency. This was the first time that Fire Chief Holliday had ever cancelled vacations. Battalion Chief Monroe Smith testified:

"Q. Have you become familiar with the policy of the department about men being on vacation?

"A. Yes.

"Q. What is that policy?

"A. The policy is on emergency recall you are subject to recall any time except on vacation.

"Q. Except on vacation?

"A. Except on vacation, and that has been the policy that has been handed down to me for the last twenty-three (23) years."

Defendants' Exhibit No. 77, which was used to determine deductions, shows a notation next to the name of P. Jones as follows:

"No answer."

A reasonable inference that may be drawn from this evidence is that P. Jones was never notified that his vacation had been cancelled. Yet on Exhibit 5(A) of Defendants, $114.20 was deducted from P. Jones' pay. These exhibits are supported by Mr. Jones' testimony at trial.

There is ample evidence in the record to show that other firemen who were on strike and did not work were paid. James Anast testified on cross-examination that:

"Q. Do you know if those men worked at any time during the strike?

"A. No, they did not work.

"Q. Now, how do you know this?

"A. Because I had conversations with these gentlemen and they told me.

"Q. You know none of them worked?

"A. None worked, because, in fact, if you remember prior, back, it was in the paper, we had the Fire Prevention Chief Dziuba, he was on an arson case here and he said he could not supply any information because he was out on strike, and yet he was paid. It is a matter of record, Sir."

Lewis C. Rogers, Jr. testified on direct examination as follows:

"A. Well, after I got back [from St. Louis], I went home, you know, and then I went down to the Fire Department, to the union hall.

"Q. Down to the union hall?

"A. Yes.

"Q. All right. While you were there at the union hall, I believe you said on or about the 5th day of August, of 1969, I now show you a list of men, which is Interrogatory 21, I believe signed by either Alfonso Holliday or Jesse Bell, City Controller, and I ask you if you saw any of those men there at the union hall.

"A. Yes, I saw some of them there.

"Q. You saw some of the men. For the benefit of the Court, will you tell us who you saw of that list at the union hall?

"A. I can remember seeing Novo Martin.

"Q. Novo Martin?

"A. Yes.

"Q. All right. Anybody else?

"A. John LaBroi."

Joseph Flynn testified on direct examination that he saw Jimmy Rowan, Nick Koss and Pete Sut. He further testified on cross-examination:

"Q. Now, while you were at the union hall, do you recall who else you saw down there?

"A. Some of the people on the list here; majority of the fellows sitting here were there.

"Q. You saw these gentlemen at the union hall?
"A. Yes, I did."
"Q. Specifically, who do you recall?
"A. Monroe Smith, Percy Jones, Jimmy Anast, Harold Cotten. I could name quite a few of them. Gene in the window.
"Q. You saw these gentlemen at the union hall during the strike?
"A. Yes, I did."

Captain William Cherry of the Gary Fire Department testified that he made up a list of the firemen out of town which was later used to determine those firemen who were actually on vacation and out of town from those firemen who were on vacation and in town. Captain Cherry explained the origin and the use of the lists when he testified on direct examination as follows:

"Q. Now, Mr. Cherry, did you make up this list?
"A. Yes.
"Q. With regard to the names shown thereon?
"A. Yes.
"Q. Now, how did you arrive at this list?
"A. From the very beginning, this list is submitted to the Fire Chief's office by April 15 of each year.
"Q. That particular list?
"A. The original vacation list.
"Q. Okay, the vacation list. Now, do you have custody of those vacation lists?
"A. Yes.
"Q. Now, are you testifying you made up this list from those vacation lists?
"A. Right.
                    *    *    *
"Q. So this list was based on the fire department records showing certain individuals to be on vacation, is that correct?
"A. Yes.
"Q. Okay. Now, for what purpose did you make up this list?

"A. I made it up at the request of Chief Holliday, list of men who was on vacation during this time and contact them and so this is what I did.

"Q. This was made up, then, on the first day of the strike, is that correct?

"A. Yes.

"Q. Now, I direct your attention, Mr. Cherry, to this notation at the side of some of these names showing "out of town." Would you testify as to how that got there?

\* \* \*

"Q. Now, why did you put down "out of town" next to a certain name?

"A. Because it has been the procedure of the fire department since my being in the personnel office, when these men are out of town, and payday falls on the date they are out of town, which is going to be the 1st and 15th, they are going to be out of town any amount of time, they inform Chief Rutell or myself to hold their checks rather than send them to the stations and let them lay around and this is what we did.

"Q. So there is a procedure used in the office to determine whether someone is out of town or not?

"A. Yes, nothing written. This is what we have been going by."

After the strike was concluded on August 10, 1969, the Board of Public Works and Safety established a policy in regard to the vacationing firemen. Jesse Edward Bell, City Comptroller and member of the Board of Public Works and Safety, testified:

"Q. —I want to know from his own personal knowledge whether he just is assuming this distinction that the firemen in town and on vacation were not to be paid and firemen who were out of town on vacation were to be paid because they didn't know about the strike, was that it?

"A. Could you ask me your question again?

"Q. All right. I will try to reframe that for you, Mr. Bell. What I want to know is, is this policy concerning firemen who were in town and on vacation and firemen

who were out of town and on vacation, there was a distinction made there, is that correct?

"A. Correct.

"Q. Now, you testified just a few moments ago that the firemen who were in town and on vacation and did not report to work were not to be paid, and the firemen who were out of town on vacation who obviously did not know about the strike were to be paid. Is that right?

"A. Correct.

"Q. Now, then, you did say also this came down from the Fire Chief, is that right?

"A. The recommendations?

"Q. Right.

"A. Yes.

\*   \*   \*   \*   \*

"Q. Did the Fire Chief appear before the Board and tell you what his recommendations were?

"A. He sent them or we had a conference, one way or the other.

"Q. You are not sure of that?

"A. I am not certain of this."

Mahlon J. Plumb, City Engineer and member of the Board of Public Works and Safety, testified:

"Q. Now, there was never any formal hearing then by the Board of Public Works and Safety to make a determination as to whether the Chief had carried out the criteria as laid down by the members of the Board of Public Works and Safety was there?

"A. No.

"Q. What kind of guidelines, then, did you give the Chief in determining whether a man was in town or out of town?

"A. The Board of Works did not give the Chief guidelines. The Chief suggested the guidelines himself, because he was the one who knew how the payroll was prepared and what kind of records they had available. This was a joint decision, mutually arrived at through our discussions. It was no instructions from the Board or orders from the Chief; it was a mutual decision at the time.

"Q. Mr. Plumb, what were the guidelines?

"A. The guidelines, as I believe I have stated, were that on vacation, for the men on vacation, those who had reported that they would be out of town through a procedure that the Chief told us was customary in the department, this guideline, this being out of town as established by this customary procedure would be the guideline to determine who would be paid and who would not be paid out of those on vacation.

"Q. What was the customary procedure?

"A. We understood there was some indication given— we did not ask the precise nature of the indication —but they did have some records in the fire department's files which were not prepared by the Chief or his staff but given by the men as to whether or not they would be on vacation.

"Q. You mean the records over at the fire department would indicate that, say, John Labroi was going out of town on vacation? Is that what you are trying to tell us?

"A. This is our understanding from the Chief's explanation of the system."

Clarence Greenwald, former Corporation Counsel for the City of Gary, testified that the "guideline or policy" was never reduced to writing and never entered upon the Board's record. IC 1971, 18-1-11-2; Ind. Ann. Stat. § 48-6102 (Burns 1963) provides:

"The commissioners *shall* cause *all* of their proceedings to be recorded. . . ." (Our emphasis.)

This court has defined arbitrary, unreasonable and capricious conduct by an administrative agency in *State Board of Tax Comm'rs*. v. *Chicago, Milwaukee, St. Paul & Pacific R. R. Co.* (1951), 121 Ind. App. 302, 308-309, 96 N. E. 2d 279:

"Arbitrary or capricious action on the part of an administrative board means willful and unreasonable action, without consideration and in disregard of the facts or circumstances of the case; action taken without some basis which would lead a reasonable and honest man to such action."

After examining all of the evidence shown by the record in this cause, we are of the opinion that the trial court's judgment that the Board of Public Works and Safety acted arbitrarily, unreasonably and capriciously is amply supported by the evidence. We find no error to the contrary in support of the "City's" contention.

The "City" further contends that the thirty-three firemen abandoned their employment and right to pay. The thirty-three firemen had already returned to work when the action was taken by the Board to determine which firemen should have a deduction from their pay. Abandonment has been defined as:

> " 'Abandonment' means an absolute relinquishment; a total desertion. . . . Intention is the first and paramount object of inquiry." Johnson v. Strickland (1953), 88 Ga. App. 281, 76 S. E. 2d 533, 535. (See also Words and Phrases, Abandon; Abandonment.)

It was reasonable for the trial court to infer from the evidence that a fireman on vacation does not intend to abandon his employment. It was further reasonable to infer from the evidence that a fireman who has returned to work and is performing his duties has not abandoned his employment. The "City" relies on *State ex rel. Palm* v. *City of Brazil* (1947), 225 Ind. 308, 73 N. E. 2d 485, 74 N. E. 2d 917. In *State ex rel. Palm, supra,* the firemen verbally resigned and were notified by the Mayor that they had been dismissed. This factual conclusion, abandonment of employment, was not based upon the existence of a strike. Our Supreme Court further stated in *State ex rel. Palm, supra,* 225 Ind. at 315:

> "The policemen and firemen involved in this law suit were not officers but were employees. Their relations to the city were entirely contractual. . . . There is nothing in the statute, however, and there was nothing in the contracts of relators herein prohibiting *them* from terminating their contracts of employment at will."

We find no merit in the "City's" contention of "abandonment."

Damages were awarded to the thirty-three firemen in the sum of $17,437.50. The "City" contends that the trial court erred in assessing damages in this amount since they were in excess of the back pay lost by the thirty-three firemen. We agree with this contention of the "City."

The record shows that only eighteen firemen testified as to their damages as a class. The record further shows that the average back pay due to each was slightly more than $100.00. Based upon this proof, the total damages would slightly exceed $2,000.00. We noted in the beginning of this opinion that the trial court had not complied with Rule TR. 23(C) (3). We further note an exchange between Mr. Ruckman, attorney for the "City," Mr. Bradley, attorney for the firemen, and the Court on pages 283-286 of the Record which would indicate that there was an appreciable degree of uncertainty as to the accuracy of the records and exhibits submitted into evidence. The court concluded this discussion on page 286 of the transcript as follows:

"THE COURT:—the City Comptroller's office keeps true and accurate records. If they don't, I am sure the State Board of Accounts is going to have something to say about it. I am sure Mr. Bell doesn't want that problem.
"So, I say, whatever records are necessary to reflect the true and accurate figure you are looking for, since they are the records of the City anyway, if we don't have them all here, whatever records there are that are necessary to bring about that figure, you gentlemen can stipulate to that and then it can be marked as an exhibit prior to judgment in this action. All right?
"MR. BRADLEY: Yes, Your Honor.
"MR. RUCKMAN: Yes.
"MR. BRADLEY: I have no objection to that stipulation.
"THE COURT: With that understanding, you can proceed with this witness."

We find no stipulation in the record as to the amount due the members of the class as agreed upon by the attorneys.

Examining Defendants' Exhibit 5(A), which is an account-

ing exhibit consisting of thirteen pages together with Plaintiffs' Exhibit No. 1, which is a letter setting forth the names of thirty-three firemen, the following names and amounts produce a sum of $3,638.35:

| | |
|---|---|
| C. Alexander | $ 114.20 |
| R. Anderson | 107.50 |
| C. Bencie | 114.15 |
| N. Bliss | 114.20 |
| A. Bono | 107.50 |
| M. Buchko | 117.50 |
| D. Cavell | 103.40 |
| E. Clune | 107.50 |
| A. Corona | 114.20 |
| W. Costley | 107.50 |
| H. Cotten | 122.50 |
| G. Droza | 103.40 |
| R. Feneck | 114.20 |
| J. Flynn | 114.20 |
| N. Gonzalez | 103.40 |
| P. Jones | 114.20 |
| J. Kish | 107.50 |
| J. Kordys | 107.50 |
| S. Lashenik | 114.20 |
| P. Locasto | 114.20 |
| W. Martinez | 114.20 |
| C. Martinie | 103.40 |
| J. Mikulich | 107.50 |
| R. Morgan | 103.40 |
| G. Mulloy | 109.20 |
| J. Mytyk | 109.20 |
| E. Onofrey | 107.50 |
| R. Piazza | 103.40 |
| D. Pozgay | 107.50 |
| G. Shonske | 109.20 |
| M. Smith | 117.50 |
| W. Stuart | 114.20 |
| F. Tokarz | 109.20 |
| | $3,638.35 |

We can only conclude from this record that damages were awarded which were approximately four times that proven even when most liberally construed from the evidence presented. Therefore, we feel that this cause should be reversed as to the award of damages with instructions to the trial court to ascertain sufficient evidence which will reflect an accurate award of damages to each member of the class that it has determined after following Rule TR. 23 (C) (3).

We do not deem it necessary to decide here the applicability of the provisions found in IC 1971, 18-1-11-3; Ind. Ann. Stat. § 48-6105 (Burns 1971 Supp.). It is clear from the evidence that no attempt was made by the "City" to comply with this statute. We do not decide its applicability here. It is unnecessary.

Furthermore, we will not prolong this opinion by a discussion of the "City's" contention: "Does either due process or equal protection guarantee the right of a public employee to be paid?" The relationship between the "City" and the firemen is contractual.

The judgment of the trial court concluding as a matter of law that the action taken by the "City" was arbitrary, unreasonable and capricious should be and the same hereby is affirmed. The trial court's judgment awarding damages to the vacationing firemen in the sum of $17,437.50 is hereby reversed with instructions to follow Rule TR. 23 (C) (3) and to further obtain the evidence stipulated by the parties or in the alternative to obtain the actual amount deducted by hearing the testimony of each fireman determined to be a member of the class under Rule TR. 23 (C) (3).

Hoffman, C.J. and Sharp, J., concur.

NOTE.—Reported in 283 N. E. 2d 582.