STATE OF INDIANA, EX REL. DEPARTMENT OF NATURAL RESOURCES, ET AL. *v.* BILLY R. LEHMAN

[No. 1-278A27. Filed July 17, 1978.]

*Theodore L. Sendak*, Attorney General of Indiana, *David Michael Wallman*, Deputy Attorney General, for appellant.

*Joseph A. Sullivan*, of Bloomfield, for appellee.

ROBERTSON, J. — Defendant-appellant the State of Indiana, ex rel. Department of Natural Resources appeals a judgment of Greene Circuit Court reversing the Natural Resources Commission's affirming disciplinary action taken against plaintiff-appellee Captain Billy R. Lehman of the Department's Law Enforcement Division (Division). We affirm.

In 1975, Lehman was arraigned before the superintendent of the Division on charges arising from a Commission investigation into allegations made against certain members of the Division. The charges against Lehman included: using a state-owned vehicle for personal use; taking a state-owned boat and motor to Florida after being ordered not to do so; using officers of the Division to deliver personal items to the superintendent's home; and, not providing effective leadership and failing to exercise good judgment in making decisions. Following the arraignment, the superintendent issued an order demoting Lehman and directing that in the event of an appeal of the demotion order Lehman would be suspended without pay pending results of the appeal. Lehman's subsequent appeal before the Natural Resources Commission resulted in the Commission's affirming the superintendent's action. A petition for judicial reveiw followed, and upon consideration of the matter, the trial court set aside the Commission's decision and remanded for further proceedings.

The State's appeal from the trial court's overruling of State's motion to correct errors raises these issues:

1. Whether the trial court erred in finding that no evidence was presented at the arraignment to support the charges filed.

2. Whether the trial court erred in its specific finding that Lehman's demotion was made without a finding of any cause as required by IC. 1971, 14-3-4-7 (Burns Code Ed.).

3. Whether the trial court erred in finding the demotion, reassignment, and suspension contained in the superintendent's special order were arbitrary, capricious, an abuse of discretion and unsupported by substantial evidence.

4. Whether the trial court erred in finding that the actions of the Commission in its conduct of the investigation and determination were in violation of IC 4-22-1-20.

5. Whether the trial court erred in finding the record of the appeal before the Commission did not contain substantial evidence of guilt as to the charges.

1.

As to the first issue, the State argues that the departmental regulations pertaining to arraignments only provide for an opportunity for the charged person to answer the charges with his own evidence and that "[t]he decision is then left up to the Superintendent, after hearing all pertinent information, as to what action will be taken." The State's tenuous assertion that certain Lehman testimony constituted "admission" of the charges levied apparently leads the State to conclude that the trial court erred in its finding that there was no evidence at the arraignment to support the charges.

Lehman, contrarily, directs us to the superintendent's Special Order 713 which reads, in part:

Captain Lehman was arraigned on the above charges on October 24, 1975 in accordance with Division regulations. A plea of Not Guilty was entered by Captain Lehman and witnesses were presented who testified as to Captain Lehman's ability and efficiency as a Regional Commander.

The testimony on which the Commission based their findings and recommendations was not made available to Superintendent Charles A. Murphy at this arraignment. No testimony was heard which could be used to find Captain Lehman guilty except the

charges based on the Commission's findings. In order to be granted an appeal to the Commission, Captain Lehman must be notified he is ordered demoted.

. . .

This unambiguous statement, which remained uncontroverted, and the superintendent's consistent testimony at the departmental hearing clearly show that the trial court correctly found that no evidence had been proffered. This issue reveals no error.

## 2.

With respect to the second issue, the State in its brief makes no attempt to apply those facts upon which it would rely to the pertinent law, aside from this cursory statement: "After hearing all of the evidence presented at the arraignment, even based on the defendant's own testimony, Superintent Murphy had evidence greater than the mere fact of the charges upon which to base the demotion and reassignment of Plaintiff [Lehman]." The State has failed to present such cogent argument as is contemplated by our appellate rules, Ind. Rules of Procedure, Appellate Rule 8.3(A)(7), and, therefore, the State has demonstrated no error.

## 3.

Next, the State contends that the superintendent's actions were not arbitrary or capricious. We disagree.

In *Hatcher v. Smith* (1972), 152 Ind. App. 299, 283 N.E.2d 582, a case cited by both parties to this appeal, the Court of Appeals quoted from *State Board of Tax Commissioners v. Chicago, Milwaukee, St. Paul & Pacific R. R. Co.* (1951), 121 Ind.App. 302, 308-309, 96 N.E.2d 279, 282.

'Arbitrary or capricious action on the part of an administrative board means willful and unreasonable action, without consideration and in disregard of the facts or circumstances of the case; action taken without some basis which would lead a reasonable and honest man to such action.'

152 Ind.App. at 310, 283 N.E.2d at 589.

We think that for the superintendent to take disciplinary measures

after he had specifically found that no evidence was presented to support the charges levied constituted arbitrary and capricious action and an abuse of discretion. We do recognize the importance of granting discretion to administrative bodies for the effective dispatch of their duties. However, notions of fairness and reasonableness dictate the result reached in this case by the trial court.

4.

The next issue relates to IC 4-22-1-20, which, in part, states:

> Whenever a hearing is conducted by an agent or representative of an agency such agent or representative who presides at such hearing shall not consult any person or party on any fact in issue unless upon notice and opportunity for all parties to participate. No agent or representative conducting a hearing shall perform any of the investigative or prosecuting functions of said agency in the case heard or to be heard by him or in a factually related case.

The State urges error in the reviewing court's finding that the Commission's actions in conducting the investigation and subsequently adjudicating the charges were violative of 4-22-1-20. We agree that the finding was in error. However, it does not present reversible error.

The State correctly points to the relevant portion of the record which indicates that those members of the Commission who participated in the investigation and who signed the investigation report disqualified themselves from the appeal proceedings. The record, moreover, shows that Lehman and his counsel agreed to let the hearing proceed and to accept the hearing verdict despite the absence of a quorum (resulting from Commission members' disqualification).

Lehman contends, though, that he did not waive any right, as the State maintains, regarding the manner in which the hearing was conducted but that the record solely indicates waiver to objection to an absence of quorum. Even if the record was susceptible of such an interpretation, Lehman failed to enter a contemporaneous objection stating the claimed grounds therefor and, thus, waived any error. Finally, our review of the hearing proceedings reveals no indication that Lehman did not have a procedurally fair hearing or that the requirements of due process were violated. Notwithstanding Lehman's reception of a

fair appeal hearing and the trial court's ruling to the contrary, we will not reverse on this issue, for we agree with the trial court on the merits that the Commission's final decision was not supported by substantial evidence. We next address that precise issue.

### 5.

With respect to the last alleged error, the State maintains that the trial court erred in its review of the Commission's determination by reweighing the evidence and that substantial evidence was presented on each of the charges made against Lehman.

As the State has properly framed the issue, we are presented the opportunity to summarize[1] the proper standard of trial court review of administrative determinations. In cases where appeal from an administrative determination is made pursuant to the Indiana Administrative Adjudication Act, IC 1971, 4-22-1-1 to 30 (Burns Code Ed.), such as in the present case, section 4-22-1-18 provides:

> 4-22-1-18 [63-3018]. Judicial review — Procedure. — On such judicial review such court shall not try or determine said cause de novo, but the facts shall be considered and determined exclusively upon the record filed with said court pursuant to this act [4-22-1-1 — 4-22-1-30].
>
> On such judicial review, if the agency has complied with the procedural requirements of this act, and its finding, decision or determination is supported by substantial, reliable and probative evidence, such agency's finding, decision or determination shall not be set aside or disturbed.
>
> If such court finds such finding, decision or determination of such agency is:
>
> (1) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; or
>
> (2) Contrary to constitutional right, power, privilege or immunity; or

---

1. For further discussion of the standard of trial court review and its application, *see Ind. Education Employment Relations Board et al. v. Board of School Trustees of Worthington-Jefferson Consolidated School Corporation* (1976), 171 Ind.App. 79, 355 N.E.2d 269.

(3) In excess of statutory jurisdiction, authority or limitations, or short of statutory right; or

(4) Without observance of procedure required by law; or

(5) Unsupported by substantial evidence,

the court may order the decision or determination of the agency set aside. The court may remand the case to the agency for further proceedings and may compel agency action unlawfully withheld or unreasonably delayed.

Said court in affirming or setting aside the decision or determination of the agency shall enter its written findings of facts, which may be informal but which shall encompass the relevant facts shown by the record, and enter of record its written decision and order or judgment.

We held in *Ind. Education Employment Relations Board et al. v. Board of School Trustees of Worthington-Jefferson Consolidated School Corporation* (1976), 171 Ind.App. 79, 355 N.E.2d 269, 273, that "the only relevant inquiry of the part of the trial court in considering factual issues decided by the agency is whether there is any substantial evidence to support the agency's determination." Furthermore, the trial court in reviewing the decision is not to weigh the evidence which was before the agency and should only enter contrary findings when " 'the evidence and finding of the administrative body is undisputed and uncontradicted and only one decision can follow.' " *Id.* at 272, quoting from *Department of Financial Institutions v. State Bank of Lizton* (1969), 253 Ind. 172, 177, 252 N.E.2d 248, 251. This is not to suggest that *any* evidence supportive of an agency's determination requires a reviewing court's affirmance;[2] we are not expounding such a standard nor could we since 4-22-1-18 requires "substantial evidence." That statutory provision, of course, does not attempt to define "substantial evidence" — a legal term which defies precise definition. As Davis, in his treatise on administrative law, has written:

"The meaning of 'substantial evidence' is about as clear and about as vague as it should be; the main inquiry is whether on the record

2. *See* comments by the writer in Utken, Administrative Law, 1977 Survey of Recent Developments in Indiana Law, 11 Ind.L.Rev. 20, 24-26, with respect to *Worthington-Jefferson.*

the agency could reasonably make the finding. . . . Despite the theory, the judges as a matter of practical fact have a good deal of elbow room to vary the intensity of review as they deem necessary or desirable in particular cases.

4 Davis, Administrative Law Treatise § 29.01 (1958).

In our opinion, where a reasonable person would conclude that the evidence as presented, with its logical and reasonable inferences, was of such a substantial character and probative value so as to support the administrative determination, then the substantial evidence standard required by IC 4-22-1-18 has been met. Substantial evidence requires something more than a scintilla[3] and something less than a preponderance[4] of the evidence. The administrative determination must be soundly based in evidence and inferences flowing therefrom. We affirm in the present case, for, in our opinion, the trial court conducted a proper review.

Turning to the case before this court, the State generally asserts that evidence was presented at the appeal hearing on each of the charges and that Lehman admitted to three of the allegations; the State, moreover, claims that the trial court improperly reweighed the evidence in making its contrary findings. We set out at some length below segments of the testimony before the Commission to show that the trial court properly concluded that the charges were not supported by substantial evidence. His contrary findings, as the evidence clearly reveals, did not require a reweighing of the evidence.

*CHARGE: Using a state-owned vehicle for personal use.*

Regarding the substantiality of this charge, the State merely adverts to an admission by Lehman. The relevant testimony by Lehman encompassing the admission is as follows:

Q.   There have been three charges filed against you. We have heard testimony from Superintendent Murphy and Officer Nelson and former Superintendent Null about these.

The one pertains to using a state owned fire truck for per-

---

3.   *Consolidated Edison Co. v. NLRB* (1938), 305 U.S. 197, 229.

4.   *Worthington-Jefferson, supra.*

sonal use. Would you tell the Commission, in your own words, the facts concerning that incident?

A. Yes, sir, I did that. I had the fire vehicle in Greene County. I've got a farm, they were drilling for oil at that time and I could not drive my car back through the field, so I drove the fire vehicle which had been a policy ever since, for the Enforcement Division, for the fighting of fires for the Conservation Officers, it had been the policy to drive those fire vehicles any time they wanted.

Q. What was the purpose of that?

A. For driving the truck back in the field. Our officers had been allowed to drive the vehicles to fight fires. He had to take care of all the fires in the County.

The trucks were assigned to us. They wanted, the Division, wanted them to drive them on off-duty hours to keep the batteries up and to keep the motor in shape.

Q. Had other officers used the fire trucks besides yourself?

A. I personally don't know of an officer that ever had a fire truck that didn't use it for his own personal use.

. . .

Q. Did there ever exist a regulation in the Division that the personnel could not drive in the Conservation Department equipment, especially, fire trucks?

A. No, sir. If there had been I wouldn't have done it. You can ask any of my superiors. I never disobeyed an order.

. . .

When questioned about this charge, Superintendent Murphy responded in this manner:

Q. Do you know, and let me ask you this first, if there was a regulation that made by yourself which, I would assume that you would issue regulations as to use of equipment, is that correct?

A. Yes.

Q. Or a Superintendent in the past who was before you, do you know of your knowledge, a regulation which you can give to

me today which so states that you cannot use vehicles or equipment belonging to the Conservation Department personnel, and officer?

A. No, I do not.

The testimony above, the only testimony relating to the charge elicited at the hearing, clearly sustains the trial court's finding on this issue which was as follows:

> (a) In regard to the charge of using state property for personal use, at most the evidence would allow Lehman readily admitted to such practice prior to a change in Department policy and prior to a regulation prohibiting same.

In our opinion, the trial court's finding was proper.

CHARGE: *Taking a state-owned boat and motor to Florida after beng ordered not to do so by then Superintendent Null.*

The State points to testimony upon direct examination by the former superintendent:

The State points to testimony upon direct examination by the former superintendent:

Q. Did Officer, or Lieutenant Lehman ever come to you and ask your permission to take a boat to Florida?

A. He did not.

Q. He never came to you?

A. No, sir. I never gave permission to Lieutenant Lehman to take a boat to Florida, but also, I never gave him the order not to because I did not know that he had taken the boat until after he had come back, at which time I was advised by my Executive Officer, Major Shell, that this had happened.

I brought Lieutenant Lehman in. He told me that he had taken the boat, he had had it insured, and I reprimanded him for it and that was it.

Q. Why did you reprimand him?

A. For taking the boat out of the State without my knowledge. There is no rule, regulation or anything else that says he can't, but also he should have, I felt, he should have come to me, but prevalent, prior to that, it was very prevalent, they used

a lot of equipment for their own personal uses.

Q. Was it customary then that some of your subordinates wished to take personal property, that they would seek your permission then? Would that be a correct statement?

A. No.

Q. What would be a correct statement?

A. Well, correct statement would be that we did not adhere to the fact that the people used State property.

Q. You did not adhere to that?

A. No, they should not use State property for their own personal use, but by the same taken [sic], there is no rule or regulation that they cannot use it.

Q. How was it established that they were not to do it if there is no written rule or regulation.

A. Well, you just did not use State property for your own personal use. That seems —

Q. Do you know when that incident occurred?

A. I guess I couldn't give you an exact date but it was in 1971.

Q. Did it ever occur again?

A. No, sir.

Q. He never took another one after your reprimand?

A. No, sir.

Cross-examination of ex-Superintendent Null included the following:

Q. . . . as I understand your testimony, you did not ever give Captain Lehman an order not to take the boat to Florida?

A. That's true.

Q. So the charge is as stated, that he disobeyed your order is incorrect?

A. Well, as far as I can remember, Lieutenant Lehman has never disobeyed an order that I gave, as far as I know.

. . .

Q. Once again, there is no regulation, or at least existing at this

time you were there, that said officers couldn't take a boat out of the State or couldn't use it for personal use, right?

A. Not that I know of.

. . .

Lehman's "admission" on this point—as claimed by the State—encompasses this colloquy:

Q. There also has been an allegation filed that you took a state owned boat and motor to Florida without being ordered to do so. Will you testify to the Commission about that incidence.

A. Yes, sir, I did that but I asked Superintendent Null at the time if I could take it and he told me I could. The only thing, I was responsible for the boat and any thing that happened to it.

With respect to the evidence on this charge, the trial court entered the following finding:

(b) In regard to the charge of taking a boat and motor to Florida *after* being ordered not to do so, the State's evidence fails to establish that any such order was given.

We must agree. The testimony as set out, *supra,* clearly shows that the trial court was correct. Moreover, the evidence shows that at the time Lehman took the boat to Florida, there was no prohibitory department rule or regulation.

*CHARGE:  Using officers of the Division to deliver personal items to Superintendent Murphy's home.*

In its brief, the State has not cited to any evidence supportive of this charge. *See* Ind. Rules of Procedure, Appellate Rule 8.3. In any event, our review of the record reveals that the trial court was correct in finding that:

(c)  In regard to the charge of using officers to deliver personal items to the Superintendent's home, State's evidence completely fails to show any such activity.

We agree. We look next to the final charge.

*CHARGE:  Not providing effective leadership and failure to exercise good judgment in making decisions.*

As to this charge, the State directs the court to testimony by one Officer Jacobus, who was questioned concerning an alleged incident at a 1968 briefing conducted by Lehman for the Crane deer hunt detail. Jacobus as an officer would not need a license to hunt deer on his off-duty hours. The incident occurred out-of-doors as the briefing was breaking up. On direct examination, the colloquy included the following:

Q. Did you ask Lieutenant Lehman about this [going hunting]?

A. I made the comment to Officer Borders, or I asked him a question, if he knew where I could purchase a deer license. I don't remember what day the meeting was on, but at any rate I was in an area unfamiliar to myself and probably it was an odd hour or something. I just asked Joe where some place was open that I could buy a deer license.

Q. Did Lieutenant Lehman overhear that conversation?

A. No, he didn't, but Officer Borders walked over to Lieutenant Lehman, both men being within my hearing and made the comment to Lieutenant Lehman that this man wants to buy a deer license.

. . .

Q. Would you relate the substance of the conversation then please?

A. It was a short conversation. Officer Borders said, referring to me, that man is going to buy a deer license, and that man wants a deer license, to which Lieutenant Lehman replied, oh, that man doesn't need a deer license, or something to this effect.

. . .

Q. Did you question Lieutenant Lehman about that comment?

A. No, sir.

Q. Was that pretty much the extent of what happened then?

A. Yes, sir.

DOCTOR SCHMELZ [Member]: What was the response of Lieutenant Lehman, that the man did't [sic] need a license?

A. It was to the effect, I don't remember the exact words, but it was that the man didn't need a deer license.

. . .

The cross-examination of Officer Jacobus included:

Q. Did you hear every word that Officer Borders said to Captain Lehman?

A. Yes, sir.

Q. Every word?

A. Yes.

Q. Repeat to me what he said?

A. He said that man wants to buy a deer license or that man wants to get a deer license, something to that effect.

Q. And Captain Lehman said what?

A. He didn't really need one, or that man doesn't need a deer license.

Q. Did Captain Lehman, did you hear Captain Lehman give you the authority to deer hunt?

A. No, sir.

Q. So he never gave you the authority to deer hunt then, correct?

A. I wondered about my off-duty time.

Q. Did Captain Lehman give you authority to deer hunt?

A. No, sir.

When questioned as to this incident, Lehman denied having ever given permission to hunt illegally.

The State also produced testimony by another officer, Beaver, regarding an allegation that Lehman had been hunting during duty hours on the first day or the first weekend of pheasant season in Warren County in 1973:

A. . . . I drove back to this area where I saw the vehicles parked. There was a hedge row and a great opening into another opening which appeared to be another cornfield. I saw several subjects in the back of a pickup truck and I did observe Captain

Lehman—at that time it would be Captain—in the back of the pickup truck with what appeared to be a firearm.

. . .

Q. Is that all he was doing, was sitting in the back of the pickup? Did he ever leave the pickup?

A. No, sir, I did not see him. The pickup drove off and I lost vision of it in the hedged road. . . .

Q. Did Captain Lehman have anybody on staff there? Was he in charge of a group at this time?

A. That I can't advise. He was with a group of people. Whether he was in charge, I cannot tell you.

. . .

Q. First weekend. You stated you saw Lieutenant Lehman. How was he dressed?

A. Looked to be in hunting garb, wearing a baseball cap.

Q. What do the regulations provide for in regard to hunting on the first day or first weekend?

A. Regulations state that all personnel work the first day of hunting season.

. . .

Q. Would working involve hunting?

A. I would say no.

The cross-examination of Officer Beaver proceeded as follows:

Q. Did you at any time see him hunting?

A. No, sir.

Q. So you do not know if he was hunting or not?

A. Well, sir, I assume that—

Q. Do you know that personally, if he was hunting?

A. I would say he was, yes.

Q. Did you see him? Did you observe him?

A. No, sir.

Q. So you don't know for a fact, correct?

A.   That's correct, sir.

Upon re-direct examination, Beaver also stated that he felt no reason to check licenses because he had no reason to suspect Lehman or any persons hunting with him would ever violate a conservation rule or regulation.

In reference to Beaver's testimony, Lehman testified:

Q.   Referring to some testimony from Officer Beaver's concerning seeing you in Warren County in 1973, were you in Warren County in 1973?

A.   I don't really know whether I was or not.

Q.   Were you in the back of a pickup truck in Warren County some time during the year 1973 in hunting garb.

A.   To be honest about it, I can't really answer that because I don't know.

Q.   Were you ever hunting during duty hours in Warren County in 1973?

A.   Not on duty hours, no.

Q.   So your answer is then, you were not hunting during duty hours in 1973?

CHAIRMAN LAHEY:   Keep in mind you are under oath, Captain Lehman.

A.   Right. Yes, sir.

Q.   Did you ever wear hunting garb during duty hours?

A.   Yes, sir. I don't know the boys that work up there. I couldn't tell you who worked there at the time but they go around in hunting clothes and everything else to try to get the slip on someone that is hunting pheasant or something without a license.

Q.   So it is a normal accepted procedure?

A.   Yes, sir.

MR. THOMPSON [Deputy Attorney General]:   Counsel is still testifying for the witness. I would like to have the last remark stricken.

CHAIRMAN LAHEY:   It is hearsay.

128

MR. SULLIVAN [Counsel for Lehman]:    He can testify.

CHAIRMAN LAHEY:   Unless you have firsthand knowledge that on those dates that people were authorized to be out of uniform and wear skull caps or something else.

A.    I can't say that happened on that day. I don't know. But I do know it has been the policy that has been done for years in Benton County.

Q.    Warren County?

A.    Benton County, is where I always worked.

Also, Officer Durbin, a witness for Lehman, testified over objection in reference to the hunting incident, as follows:

A.    . . . . I was with Lieutenant Lehman, at this time, and as I stated, he probably does not recall but I ate breakfast with him at that time and he also was off-duty. He was not working because, I think I made the comment, what are you doing up here on your day off, and he was coming up to hunt, but like I say, he probably doesn't remember that. However, I did eat breakfast with him at the restaurant and he was off-duty.

I did not see him in a truck or any thing of this nature. However, I do know that, by his own statement, that he was off-duty and the other individuals that were with him.

CHAIRMAN LAYEY:    Was that the opening day of the hunting season?

A.    I can't recall sir. I was there for four days. I can't recall if it was opening day or not.

MR. LIEBER [Member]:    This is important because opening day, that is the day that he spoke about it.

A.    I cannot verify that, sir.

MR. SULLIVAN:    I think Officer Jacobus testified it was the first weekend, if I recall correctly, Officer Durbin.

A.    It was some time, yes, because we were always there during the first three to five days of opening season.

The State also points to the delivery of a number of confiscated fishing nets to Lehman's residence. The State called Officer Cooper:

Q.  ... Referring to commercial fishing, what did you do with the nets after you confiscated them?

A.  Well, as a rule, we destroyed them.

Q.  Did you always destroy them?

A.  No, sir.

Q.  On what occasions did you not destroy them?

A.  On one occasion we turned them all into Fire Headquarters. I'm sorry, to our Supply Department. Other occasions, I had some of them delivered to Captain Lehman's house, or to his farm, I'm sorry.

Q.  When would this have been?

A.  Probably sometime in '74. I'm not sure.

Q.  What do the regulations state about what you should do with these nets after they were confiscated?

A.  They were to be destroyed. I don't know that this is a written policy. There was a policy that has been accepted in the Division since I've been here, that they were to be destroyed.

Q.  On how many occasions did you deliver them to Captain Lehman?

A.  I never delivered them at all. I had them delivered one time.

Q.  One time?

A.  Yes, sir.

Q.  Upon whose instruction, if you know?

A.  Captain Lehman's.

Upon cross-exam, Cooper was questioned further:

Q.  When you confiscate fishing nets, you either destroyed them or, you mentioned, you turned them into Fire Supply?

A.  To our general Supply Headquarters.

Q.  Was there any regulation which says that when Captain Lehman was the Regional Commander?

A.  Yes.

Q. Is there any regulation that says you are not to turn them over to the Regional Commander?

A. Not that I'm aware of.

Q. In other words, he can use them himself if he so desires?

A. I would say so.

Q. Do you know what he did with them?

A. I have no idea.

Lehman subsequently testified on this matter.

Q. Pertaining to Lieutenant Cooper's testimony concerning some fishing nets being taken, would you tell the Commission about that matter.

A. Yes, sir, I can. This happened, I don't know what date Chuck said, but it happened after the Superintendent had taken office.

Q. Superintendent who?

A. Murphy. He wanted pictures run in the paper, and that's why those things were brought there, to my place. I was trying to get all this stuff together, all the things taken out of the river, to get a picture and, if you will, ask the Superintendent too. I'm sure he will tell you that. Those things laid down there at my place, and they're still there. You can go down and look at them. There are weeds growing up around them and everything.

CHAIRMAN LAHEY: Question of the Commission. Were any of these nets ever given to any other person?

A. No, sir.

CHAIRMAN LAHEY: Were they ever used in pursuit of any illegal fishing, or any fishing?

A. Not after those nets were confiscated. They were used illegally before. But after they got to me, they never left my farm.

MR. LIEBER: You said Superintendent Murphy wanted this picture taken?

A.   Yes, sir.

Finally, regarding this fourth charge, the State merely adverts to Lehman's admitting to driving on an expired driver's license. The record shows that Lehman received a warning and thereafter had his license renewed.

The trial court entered this finding on the fourth charge:

(d)   In regard to the charge of not providing effective leadership and failing to exercise good judgment in making decisions, the State presents evidence of a remote incident in 1968; of Lehman hunting in 1973 with no evidence that he was doing so other than on off-duty time; of department confusion over confiscated fishing nets, and, of a warning ticket issued to Lehman for driving while license expired.

We concur fully in the trial court's finding. The elicited evidence on its face lacks any hard and substantive quality — certainly not such evidence as to reasonably find an officer guilty of such serious charges.

The evidence presented in this case as to the charges levied was such that any reasonable man would not have reached the same conclusion as that reached by the Commission. We affirm the trial court's findings and judgment.

Affirmed.

Lybrook, P.J. and Lowdermilk, J. concur.

NOTE — Reported at 378 N.E.2d 31.