**In the Matter of CITY INVESTING COMPANY.**

**GDV, INC., City Investing Company and GDV, Inc., Appellants,**

v.

**Stephen M. COONS, Securities Commissioner of the State of Indiana, and Stokely–VanCamp, Inc., Appellees.**

**No. 2–779A211.**

Court of Appeals of Indiana, Fourth District.

Oct. 14, 1980.

Rehearing Denied Dec. 11, 1980.

---

Harry L. Gonso, Ice, Miller, Donadio & Ryan, Indianapolis, Vaughn C. Williams, Jeffrey I. Glekel, Laura A. Ward, Skadden, Arps, Slate, Meagher & Flom, New York City, for appellants.

Jerry P. Belknap, Barnes, Hickam, Pantzer & Boyd, Indianapolis, John W. Castles, III, Lord, Day & Lord, New York City, for appellee Stokely--VanCamp, Inc.

Theodore L. Sendak, Atty. Gen., Ronald J. Semler, Asst. Atty. Gen., Indianapolis, for appellee Stephen M. Coons, Securities Commissioner of the State of Indiana.

YOUNG, Presiding Judge.

City Investing Company and GDV, Inc., appeal from a cease and desist order issued by the Indiana Securities Commissioner prohibiting further acquisition of shares in Stokely--VanCamp, Inc., until they comply with the Indiana Takeover Offers Act, IC 1976, 23-2-3.1-1 through --11 (1979 Supp.), and the Securities Regulation Act, IC 1976, 23-2-1-1 et seq. Because we find it dispositive of this appeal, we reach only two of the issues raised.

The facts as found by the Commissioner are as follows. Stokely–VanCamp, Inc., is a publicly held corporation organized under the laws of Indiana, having approximately 3,300,000 shares of Common Stock outstanding. The largest single shareholder owns about 11% of the outstanding shares. The officers and directors as a group own 12–

13%. Stokely's shares are traded on the New York Stock Exchange. City Investing Company and GDV, Inc., are Delaware corporations with principal executive offices in New York. City Investing is the beneficial owner of about 66% of GDV, Inc.'s common stock. GDV, Inc., was formed in 1977, with a single subsidiary, to carry out a program of diversification through acquisition. Since its formation, GDV, Inc., has acquired three additional subsidiaries.

In July, 1978, Douglas Campbell, president and principal owner of Argyle Research Corporation, a finder in mergers and acquisitions, told Frederick Selby, vice president and consultant in the mergers and acquisitions department of Bankers Trust Company, that Stokely–VanCamp, Inc., was a good candidate for acquisition and that Campbell was personally acquainted with Alfred Stokely, chairman of the Board and Chief Executive Officer of Stokely–VanCamp, Inc.

On October 2, 1978, Peter Huang, President of City Investing and President and Chief Executive Officer of GDV, Inc., told Selby in a telephone conversation that he was interested in a food company acquisition. Selby informed Huang that Stokely–VanCamp, Inc., was a potential candidate and that Campbell was acquainted with Alfred Stokely. Huang authorized Selby to make appropriate arrangements through Campbell.

On that same date, GDV, Inc., began purchasing Stokely–VanCamp, Inc., shares on the New York Stock Exchange through First Boston Company. The initial order was to buy 160,000 shares as inexpensively as possible. First Boston Company received a "hold–harmless" indemnity letter from GDV, Inc., in connection with the purchase of Stockley–VanCamp, Inc., shares. The purchases were made through a numbered account, using "two–dollar" floor brokers not affiliated with First Boston Company. GDV, Inc., internally recorded its purchases as "Acquisition of: 'A' Company."

Selby then telephoned Campbell and asked him to arrange a meeting between the principals of Stokely–VanCamp, Inc., and City Investing Company. Campbell agreed. Selby wrote to Huang October 3, 1978, confirming their conversation on the previous day. He wrote,

> Bankers Trust is working with Douglass Campbell of Argyle Research Corporation on this possible acquisition. Doug has a closer relationship with Mr. Stokely than does our bank . . . . You mentioned that you view the amount of the fee as being negotiable. We believe that an amount slightly under 1% for the purchase price of 100% of the firm would be proper . . . . This is a sensitive situation and very much depends on personalities. The company is not officially 'for sale.'

Prior to contacting anyone at Stokely–Van-Camp, Inc., Campbell telephoned Huang who told him to go ahead with the arrangement of a meeting. Following this call, Huang sent a City Investing Company vice president to provide Campbell with historical, financial and other information about City Investing Company to be passed on to Alfred Stokely.

Campbell met Alfred Stokely at Stokely's office in Indianapolis with a letter of authority to represent City Investing Company. Campbell explained the growth of City Investing Company and GDV, Inc., through acquisitions and told Stokely that George Scharffenberger, Chairman of the Boards of City Investing Company and GDV, Inc., and Chief Executive Officer of City Investing Company, was serious about acquiring Stokely–VanCamp, Inc., and wanted to meet him. The following day, Campbell reported to Huang by letter that Alfred Stokely agreed to meeting Scharffenberger but wished it to be exploratory only.

Huang's personal assistant prepared at his direction a study of tender offers for food companies under date of October 18, 1978. On October 12, 1978, Selby wrote to Campbell about splitting fees for the Stokely–VanCamp, Inc., acquisition. By October 19, 1978, GDV, Inc., had acquired 41,900 shares of Stokely–VanCamp, Inc., approximately 1.25% of the outstanding shares.

On October 20, 1978, Scharffenberger met Alfred Stokely and Leonard Delehanty,

Vice–Chairman of the Board and Chief Administrative Officer of Stokely–VanCamp, Inc. Scharffenberger indicated his interest in a merger and explained that Stokely–VanCamp, Inc., would be the cornerstone in City Investing Company's long–term plans to participate in the food industry. He stated that it was not his style to make unfriendly tender offers and that City Investing Company always preferred to retain the management of acquired companies. Scharffenberger indicated that while City Investing Company did not presently have the funds to purchase Stokely–VanCamp, Inc., he had been able to raise two hundred million dollars with just four calls in connection with a prior acquisition. Stokely and Delehanty responded that Stokely–VanCamp, Inc., was not for sale. Scharffenberger then stated that an insurance subsidiary of City Investing Company would be purchasing up to 4.9% of Stokely–VanCamp, Inc., common stock, although he was aware that GDV, Inc., was the purchasing subsidiary and that the purchases had already begun. After the meeting, Scharffenberger informed Selby that "Mr. Stokely was not all that intrigued about being acquired." Selby informed Campbell who called Alfred Stokely to urge another meeting.

On October 30, 1978, Campbell telephoned Delehanty who repeated that Stokely was not interested and stated that Scharffenberger had promised no unfriendly tender offer would take place. Campbell called Selby who in turn called Scharffenberger. Scharffenberger stated that he had not ruled out an unfriendly tender offer at the meeting. Campbell, being so advised by Selby, telephoned Alfred Stokely to inform him that Scharffenberger had not committed himself not to make an unfriendly tender offer, and that City Investing Company either now had, or would soon have, just under 5% of Stokely–VanCamp, Inc.'s, outstanding stock. Campbell further advised Stokely that he should negotiate a merger now while he still had "leverage." This conversation was reported to Scharffenberger through Selby.

Through November of 1978, Scharffenberger twice telephoned Alfred Stokely, and Campbell called a director of Stokely–VanCamp, Inc., to enlist his aid in procuring another meeting. Alfred Stokely returned one of Scharffenberger's calls and was advised that City Investing Company owned 100,000 shares of Stokely–VanCamp, Inc., stock.

GDV, Inc., ceased its purchases on November 28, 1978, with the exception of 2,900 shares purchased February 5, 1979. Scharffenberger and Campbell each telephoned Alfred Stokely in late March, 1979, to advise him of continued interest in a merger. On March 26, 1979, GDV, Inc., resumed its acquisition of Stokely·VanCamp, Inc., shares. By April 23, GDV, Inc., had acquired over 53,000 additional shares, bringing its total holdings to over 168,000 shares, more than 5%. On April 16, 1979, David Brown, general counsel of City Investing Company, sent Huang a copy of Article 16 of Stokely·VanCamp, Inc.'s, Articles of Incorporation, concerning the requirements for a merger or consolidation of Stokely–VanCamp, Inc., with another company controlling 5% or more of its shares.

On April 30, 1979, Delehanty telephoned Scharffenberger in Hong Kong. Scharffenberger stated that he had just finished a phone call with Brown, who later executed City Investing Company's and GDV, Inc.'s Schedule 13D. Scharffenberger said that they had been buying stock and now owned more than 5%, that their purchase was just for investment, that he did not have the money to buy 20% of Stokely–VanCamp, Inc.'s shares, and that he might buy 7 to 8%.

On May 2, 1979, GDV, Inc., and City Investing Company filed a Schedule 13D[1]

1. Section 13(d) of the Securities and Exchange Act, 15 U.S.C. 78m(d), states in pertinent part: (d)(1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 12 of this title, ... is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its

with the Securities and Exchange Commission, disclosing GDV, Inc.'s ownership at that date of 168,400 shares (or 5.1%) of Common Stock. The 13D stated:

> GDV currently intends to acquire from time to time such number of additional shares of Common Stock that will, together with the shares of Common Stock currently owned by it, result in the ownership by GDV of in excess of 15% and as much as 20% of the outstanding voting securities of the Company.

and that:

> The purpose of the purchase of the 168,400 shares of Common Stock acquired as described in Schedule I hereto and the proposed purchase of additional shares of Common Stock as described in Item 1 is to provide GDV with an investment in the Company. The acquisition of such additional shares and the time of acquisition thereof are subject to market conditions.

> While neither GDV nor City currently intends to seek representation on the Board of Directors of the Company or otherwise to seek to exercise control over the Company they may depending on circumstances existing in the future, seek to acquire sufficient additional shares of Common Stock so that they can exercise control over the Company.

> GDV and City reserve the right to acquire shares of Common Stock, in addition to those currently proposed to be acquired, as such prices and on such terms as GDV or City may deem advisable, through open market or private purchases or otherwise. In addition, GDV and City reserve the right to dispose of shares of Common Stock heretofore or which may hereafter be acquired, in the open market or in private transactions or otherwise. GDV and City also reserve the right to elect not to purchase any of the additional shares of Common Stock presently proposed to be acquired.

A copy of the Schedule 13D was delivered to Alfred Stokely's office in Indianapolis on May 2, 1979.

The following day Campbell telephoned Otto Frenzel, a director of Stokely, and advised him that, in view of the filing of the Schedule 13D by City Investing Company and GDV, Inc., "time was running out" for Stokely. Campbell suggested that Mr. Stokely sit down then to negotiate with Scharffenberger, "rather than waiting until later when [Stokely] would have far less leverage." Campbell reminded Frenzel that Scharffenberger had made no commitment to refrain from making an unfriendly tender offer for Stokely. Selby, having read about the filing of GDV, Inc., and City Investing Company's Schedule 13D in the newspaper, telephoned Campbell to urge a renewed effort for City Investing Company's acquisition of Stokely–VanCamp, Inc. Campbell advised Selby that he had such an effort underway. On May 4, 1979, Campbell wrote to Scharffenberger suggesting that Scharffenberger arrange a meeting with Alfred Stokely the following week, characterizing Stokely as "a little naive in this area." Campbell sent memorandums of his conversation with Frenzel to both Scharffenberger and Selby. Selby understood Campbell's statements to Frenzel as meaning that City Investing Company would be purchasing 20% of Stokely–VanCamp, Inc.'s, stock and possibly more at a later date, and that time was running out for Stokely.

---

principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors.

The following subparagraphs require information as to the identity of the purchasers, the source of funds, any plans affecting the structure of the corporation if the purpose of the purchases is to acquire control, the number of shares beneficially owned, and information as to any contracts, arrangements or understandings with any person with respect to any securities of the issuer. Amendments must be filed if any material change occurs in the facts set forth.

On May 15, 1979, Scharffenberger wrote to Campbell indicating that all further negotiations with Stokely should be left to him, and asked that Campbell discontinue his activities. At some time in May, after the filing of the Schedule 13D, Scharffenberger ordered Huang to cease purchasing Stokely–VanCamp, Inc.'s stock due to the impending recession. GDV, Inc., purchased 3,800 shares of Stokely–VanCamp, Inc., on May 14, 1979, at the New York Stock Exchange, and on May 16 and 21, 1979, purchased a total of 7,500 shares. The latter purchases were later cancelled due to the cease and desist order.

With regard to the market impact of the Schedule 13D, the Indiana Securities Commissioner found that although the filing of Schedule 13Ds is not usually widely reported in the public press, that of City Investing Company and GDV, Inc., was carried on the Dow Jones broad–tape and reported in the May 3 issue of the Wall Street Journal. Schedule 13D filings are routinely widely disseminated within and scrutinized by the financial community. To an experienced broker, the filing of a Schedule 13D is a message that there has been or is a buyer in the market who wants to see more stock. As a result of learning such information, brokers routinely identify and contact shareholders of the company whose shares are being purchased to solicit interest in selling their shares to the buyer which has filed the Schedule 13D. Such proposed sales are then offered to the buyer. A statement in the Schedule 13D that the buyer intends additional substantial purchases, such as an additional 15% of the outstanding shares, is very helpful in promoting such activity by brokers. Scharffenberger knew that the filing of the Schedule 13D respecting GDV, Inc.'s purchases of Stokely–VanCamp, Inc., stock would stimulate such activities by brokers.

After the filing of the Schedule 13D, City Investing Company was approached by a Canadian broker who "represented" or was "in some way . . . related" to 20% of the outstanding shares of the Stokely and who offered to sell them to City Investing Company. Huang met with him for an hour

and neither accepted nor refused the offer. A subsequent meeting was held in Toronto concerning this block, attended by Brown and David Ormsby of Cravath, Swaine and Moore, counsel to City Investing Company.

The Indiana Securities Commissioner found that if the Schedule 13D filed by City Investing Company and GDV, Inc., had stated a current intention to acquire control of Stokely–VanCamp, Inc., the market price of Stokely–VanCamp, Inc.'s, shares would have risen significantly.

The ultimate findings of the Commissioner, based on these facts are that City Investing Company and GDV, Inc., have intended to acquire control of Stokely–VanCamp, Inc., at least since October 2, 1978, and that Campbell acted as their agent. The purchases of Stokely–VanCamp, Inc., stock were in furtherance of the planned acquisition. The Commissioner found that the statements in the Schedule 13D pertaining to the investment purpose, the percentage of Stokely VanCamp, Inc., stock to be acquired, and the disclaimer of intent to seek control, were false and received wide public dissemination. The known and intended impact on the shareholders was that the brokers' community was prompted to solicit sales of shares and to accumulate blocks to sell to City Investing Company and GDV, Inc. Further, the selling shareholders were deprived of the profits they would have made, had not the market price been unfairly depressed due to City Investing Company and GDV, Inc.'s dissembling of their intent to acquire control.

The Commissioner concluded that the Schedule 13D and its attendant publicity constituted a takeover offer under IC 1976, 23–2–3.1--1(i) (1979 Supp.), and that City Investing Company and GDV, Inc., have made no attempt to comply with the provisions of the Takeover Act. The Commissioner found further that City Investing Company and GDV, Inc., violated IC 1976, 23–2–1–12(2), which prohibits making untrue statements of material fact or misleading omissions of material facts in connection with the offer, sale, or purchase of any

security. The Commissioner ordered that City Investing Company and GDV, Inc., cease further acquisition of Stokely–Van-Camp, Inc., shares until they have fully complied with IC 1976, 23–2–1–1 through –20, and IC 1976, 23–2–3.1–1 through –11.

We limit our review to whether the Commissioner could reasonably determine on the basis of the basic facts found by him that the actions of City Investing Company and GDV, Inc., constituted a violation of the Indiana Takeover Offers Act and Securities Regulation Act. *Podgor v. Indiana University*, (1978) Ind.App., 381 N.E.2d 1274, 1280.

### I.

The Indiana Takeover Offers Act, IC 1976, 23–2–3.1–1(i) (West 1979 Supp.) defines a "takeover offer" as:

[A]n offer to acquire or the acquisition of any equity security of a target company *pursuant to a tender offer or request or invitation for tenders,* if, after the acquisition, the offeror is directly or indirectly a record or beneficial owner of more than ten percent (10%) of any class of the outstanding equity securities of the target company. The term does not include an offer:

(1) pursuant to an offer effected by or through a broker–dealer in the ordi-

nary course of his business, without solicitation of orders, to sell equity securities of a target company.

(Emphasis added.) The appellees have argued that the Act is intended to regulate all shifts in control of a company through purchases of stock, not merely tender offers. We believe this interpretation is overbroad and contrary to the plain language of the Act.

An examination of the Williams Act, 15 U.S.C. § 78n(d)(1)[2] discloses the source of the language used in the Indiana Act. That section regulates

[U]se of the mails or . . . any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, *to make a tender offer for, or a request or invitation for tenders* of, any class of any equity security which is registered pursuant to section 78e of this title . . . . (Emphasis added).

We note that historically the term "takeover bid" was used to describe conventional tender offers when used as takeover devices. *See Smallwood v. Pearl Brewing Company*, (5th Cir. 1974) 489 F.2d 579, *cert. denied* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113. *See also* Report of the Committee on Interstate and Foreign Commerce of the House of Representatives, 2 U.S.Code Cong. & Admin.News, p. 2811 (90th Cong. 2d Sess. 1968) recommending the enactment of the

**2.** This section, hereinafter referred to as Section 14(d), forbids the making of tendered offers or requests or invitations for tenders:

[u]nless at the time copies of the offer or request or invitation are first published or sent or given to security holders such person has filed with the Commission a statement containing such of the information specified in section 13(d) of this title, and such additional information as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors. All requests or invitations for tenders or advertisements making a tender offer or requesting or inviting tenders of such a security shall be filed as a part of such statement and shall contain such of the information contained in such statement as the Commission may by rules and regulations prescribe. Copies of any additional material soliciting or requesting such tender offers subsequent to the initial solicitation or request shall contain such informa-

tion as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors, and shall be filed with the Commission not later than the time copies of such material are first published or sent or given to security holders. Copies of all statements, in the form in which such material is furnished to security holders and the Commission, shall be sent to the issuer not later than the date such material is first published or sent or given to any security holders. Subsections (d)(5) through (d)(7) provide that tendering shareholders may withdraw their shares at any time during the first seven days of the offer, that offerors must purchase shares *pro rata* if more than the desired number of shares are tendered, and that if the offeror varies the terms of the offer by increasing the price, the increased consideration must be paid to all the shareholders whose securities are bought pursuant to the tender offer.

Senate Bill which was to become the Williams Act tender offer provisions and referring to a cash tender offer as "alternatively called a takeover bid." The appellees refer us to *Televest, Inc. v. Bradshaw*, (4th Cir. 1980) 618 F.2d 1029, and *Strode v. Esmark, Inc.*, (Franklin Circuit Ct., Ky. 1980) [Current Binder] Fed.Sec.L.Rep. (CCH), ¶ 97,-538, as authority supporting a broader construction. *Televest, Inc.*, however, concerns a provision of the Virginia Takeover–Bid Disclosure Act, Va.Code Ann. § 13.1.--529(b)(iii) (Supp.1979) for which there is no Indiana counterpart, as does *Esmark, Inc.*, regarding KRS § 292.570(2) (Supp.1979).

■ Where a term has an established legal significance it is presumed that legislators intended the same significance to attach by use of that term, absent any indications to the contrary. Thus, it is presumed that when language or statutes are adopted from another state or country, constructions placed on such language or statutes are adopted as well. This has long been accepted in Indiana. *See Clark v. Jeffersonville M. & I. R. Co.*, (1873) 44 Ind. 248, *Jenson v. Pritchard*, (1950) 120 Ind.App. 439, 90 N.E.2d 518, *reh. denied* 91 N.E.2d 846. *See also* 2A Sutherland, Statutes and Statutory Construction § 47.30 (4th ed. 1973); 73 Am.Jur.2d, Statutes § 239 (1974). Because IC 23–2–3.1–1(i) expressly defines a takeover offer as an offer to acquire the equity security of a company pursuant to that which is regulated by the Williams Act, 15 U.S.C. § 78n(d)(1), we must look to the decisions under that act to determine whether City Investing Company and GDV, Inc., have engaged in a tender offer or a request or invitation for tenders. *Cf. Orion's Belt, Inc. v. Kayser–Roth Corp.*, (D.Ind.1977) 433 F.Supp. 301 (IC 1976, 24–1–2–1 substantially patterned on the Sherman Anti–Trust Act, 15 U.S.C. § 1).

A succinct description of a tender offer is found in the Senate Reports connected with the passage of the Williams Act:

> The offer normally consists of a bid by an individual or group to buy shares of a company—usually at a price above the current market price. Those accepting the offer are said to tender their stock for purchase. The person making the offer obligates himself to purchase all or a specified portion of the tendered shares if certain specified conditions are met.

S.Rep.No.550, 90th Cong., 1st Sess. 8 (1967), H.R.Rep.No.1711, 90th Cong., 2d Sess. 8–9 (1968) U.S.Code Cong. & Admin.News, p. 2811. A fuller statement is found in Note, *The Developing Meaning of "Tender Offer,"* 86 Harv.L.Rev. 1250, 1251–52 (1973):

> A tender offer has been conventionally understood to be a publicly made invitation addressed to all shareholders of a corporation to tender their shares for sale at a specified price. Cash or other securities may be offered to the shareholders as consideration; in either case, the consideration specified usually represents a premium over the current market price of the securities sought. This opportunity to tender shares at a premium remains open for only a limited period of time, often about two weeks.
>
> A distinctive aspect of the conventional tender offer is that offerors typically condition their obligation to purchase on the aggregate tender of a stated number of shares. If fewer than the stated number are tendered, the offeror need not purchase any shares. If more than the stated number are tendered, the offeror is not required to purchase the excess. Meanwhile, during the period in which the overall response is being determined, the shareholder relinquishes control over his tendered shares; they are placed with a depositary, the shareholder having only limited access to them. The position of a shareholder in a conventional tender offer is thus in sharp contrast with his position in ordinary market and negotiated transactions, where sellers retain control over their securities until a sale is completed.

(Footnotes omitted). The purpose of the Williams Act tender offer provisions is to insure that shareholders faced with a tender offer are not required to respond without adequate information regarding the quality and intentions of the offeror

and without the target management's having had an opportunity to express and explain its position. *Rondeau v. Mosinee Paper Corp.*, (1975) 422 U.S. 49, 58, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12; *Electronic Specialty Co. v. International Controls Corp.*, (2d Cir. 1969) 409 F.2d 937, 6 A.L.R.Fed. 881.

██ The failure of Congress and the Securities Exchange Commission to provide a definition of a tender offer has been held to indicate an intent to allow case–by–case development and liberal interpretation so as to give effect to the broad remedial purposes of the Act. *Smallwood v. Pearl Brewing Company, supra*, 489 F.2d at 598. This supposition is borne out by SEC Exchange Act Release No. 12676, [1976–1977 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 80,659, at 86, 695–96 (Aug. 2, 1976), in which the Securities Exchange Commission expressly declined to promulgate a regulation defining "tender offer" in light of "the dynamic nature of these transactions and the need of the Commission to remain flexible ...." The Commission, however, has listed eight factors to be taken into consideration in determining whether acquisitions constitute tender offers under the Williams Act, as *amicus curiae* in *Brascan Ltd. v. Edper Equities Ltd.*, (S.D.N.Y.1979) 477 F.Supp. 733, 791 n. 13: the Commission notes whether there has been "active and widespread solicitation of public shareholders," whether the solicitation is "for a substantial percentage of the issuer's stock," whether the offer to purchase is "at a premium," whether the terms of the offer are "firm rather than negotiable," whether the offer is "contingent on the tender of a fixed minimum number of shares," whether the offer is "open for only a limited period of time," whether the shareholders are "subjected to pressure to sell their stock," and whether "public announcements of a purchasing program ... precede or accompany a rapid accumulation." A definition has been proposed by the author of Note, *The Developing Meaning of "Tender Offers"*, *supra*, 86 Harv.L.Rev. at 1281: "a tender offer should include any offer to purchase securities likely to pressure shareholders into making uninformed, ill–considered decisions to sell." The author suggests that the popularity of cash tender offers as takeover weapons, as compared to proxy contests and exchange tender offers, was greatly due to the gap in takeover attempt disclosure legislation giving cash tender offers the advantage of surprise: "The existence of this 'gap' in takeover attempt disclosure was a major impetus toward passage of the Williams Act in 1968." *Id.* at 1253–54. The Williams Act includes Section 13(d) as well as Section 14(d), and the author notes that application of the proposed test requires an awareness of the two sections' interaction:

> Section 13(d)(I) requires disclosure of the same information as section 14(d)(I), but not until as late as 10 days after a party has acquired, by any means, more than 5% of a class of registered equity securities. Together, the two sections may be viewed as serving an overall congressional purpose of closing the "gap" in takeover attempt disclosure by providing shareholders substantial and timely disclosure whenever shares are being acquired in any potential takeover situation. The creation of the separate early–disclosure requirement for tender offers in section 14(d)(I) apparently reflects congressional awareness of the acute speed with which the conventional tender offer–compared to other means of securities acquisition governed only by section 13(d)(I) could accomplish a corporate takeover.

(footnotes omitted) 86 Harv.L.Rev. at 1257, and explains further:

> If § 14(d)(I) did not exist, a party making a cash tender offer would not have to file a disclosure statement until 10 days after it had passed the 5% ownership level. By that time, it could quite conceivably have gone on to amass a controlling interest, making the disclosure untimely.

*Id.*, fn. 42. It is frequently stated that the purpose of Section 13(d) "is to 'alert the market place to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might

represent a potential shift in corporate control.'" *Chromalloy American Corp. v. Sun Chemical Corp.*, (8th Cir. 1979) 611 F.2d 240, 248, *quoting Financial General Bankshares, Inc. v. Lance*, [1978 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 96,403 at 93,424, *quoting GAF Corp. v. Milstein*, (2d Cir. 1971) 453 F.2d 709, 717, *cert. denied*, 406 U.S. 910.[3]

We believe that the proposed definition would apply the provisions of Section 14(d) where transactions, normally regulated by Section 13(d), are attended by shareholder pressures characteristic of conventional tender offers to the degree that the protection of Section 13(d) is inadequate. The Securities Exchange Commission's list of factors may be viewed as a list of those characteristic shareholder pressures. The case of *Wellman v. Dickinson*, (S.D.N.Y. 1979) 475 F.Supp. 783, is an example in which the Commission's considerations operate as a practical application of this proposed rule as we understand it. The Court characterized the Commission's factors as "the qualities that set a tender offer apart from open market purchases, privately negotiated transactions or other kinds of public solicitations." 475 F.Supp. at 824.

The Harvard article's proposed rule has been accepted in some cases, *see, e. g., Panter v. Marshall Field & Co.*, (N.D.Ill.1980) [1979–1980 Transfer Binder] Fed.Sec.L.Rep. (CCH), ¶ 97,299, at 97,056 and *Nachman Corporation v. Halfred, Inc.*, (N.D.Ill.1973) [1973–1974 Transfer Binder] Fed.Sec.L.Rep. (CCH), ¶ 94,455, at 95,590, and rejected in others as too broad, *see, e. g., Brascan Ltd. v. Edper Equities Ltd., supra*, 477 F.Supp.

at 790;[4] and *D–Z Investment Co. v. Holloway*, (S.D.N.Y.1974) [1974–1975 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,771, at 96,562–63. Nevertheless, all appear to agree that the term tender offer does not include open market purchases alone, even if aimed at acquiring control. *See* Note, *The Developing Meaning of "Tender Offers", supra*, at 1273–74; E. Aranow, H. Einhorn & G. Berlstein, Developments in Tender Offers for Corporate Control 11, 13 (Columbia University Press 1977). It is suggested that in such cases the pressure on shareholders is no different than that in all market transactions, so no special protection is required, Einhorn and Blackburn, *The Developing Concept of "Tender Offer"*, 23 N.Y.L.S.L.Rev. 379 (1978), and that the specific provisions of § 78n(d)(5)–(7) relating to withdrawal rights, pro rata purchases and price equality would be unworkable. *Kennecott Copper Corp. v. Curtiss–Wright Corp.*, (2d Cir. 1978) 584 F.2d 1195, 1207. In *Brascan Ltd. v. Edper Equities Ltd., supra*, 477 F.Supp. at 790, the court added that:

> The consequence of bringing such large scale open market and privately negotiated purchases within the scope of the Williams Act would be to rule, in effect, that no large scale acquisition program may be lawfully accomplished except in the manner of a conventional tender offer. While this may be a sensible legislative provision ... there is nothing in the legislative history or the text of the Williams Act which suggests that it intended to bring about such consequences.

3. It may be said that while Section 14(d) regulates tender offers, Section 13(d) regulates "creeping tender offers," see 3B H. Bloomenthal, Securities and Federal Corporate Law § 13.22 (1979 revision).

4. The court stated:

There are serious problems with this form of statutory interpretation. First of all the legislative history of the Williams Act shows that it was passed with full awareness of the difference between tender offers and other forms of large scale stock accumulations. Statements by Senator Williams, the proponent of the bill and by SEC Chairman Manuel Cohen at the legislative hearings specifically

advert to the fact that tender offers are distinguishable from other forms of large scale stock accumulation including privately negotiated transactions. Indeed, the provisions of the Williams Act itself acknowledge those distinctions since it provides for different consequences where an initial accumulation is acquired by tender offer as opposed to where it is acquired by other methods. There can be no question that Congress regulated what it wished to regulate and chose not to regulate what it did not wish to regulate.

(footnote omitted).

The legislative history amply supports this view.[5]

Where open market purchases are preceded or accompanied by public announcements of large scale buying programs, however, the impact on shareholders may be substantially similar to that of conventional tender offers. The "purchaser, by judicially managing publicity releases concerning the projected number of shares to be purchased, price to be paid, and expected length of time necessary for the purchases to be completed, can make purchases using all the techniques of a tender offer without ever making a formal offer." (footnote omitted). Einhorn and Blackburn, *The Developing Concept of "Tender Offer", supra.* Nevertheless, there is disagreement whether the definition of tender offer should include such situations. The abovementioned authors point out that disclosures of buying programs are sometimes mandatory under Section 13d of the Williams Act, the anti-fraud sections, 10(b) and 14(e), or other statutes, and that the impossibility of applying the withdrawal, proration and equal price subsections of 14(d) remains. They conclude that regulation of such publicity may be desirable but it would be better accomplished by specific legislation directed to that end rather than by questionable application of the tender offer provisions, which might have the effect of prohibiting such market purchases. The Securities Exchange Commission has taken the position that forms of open market purchase programs which are in effect tender offers should be regulated as such under the Williams Act, but excludes from the tentative definition, published for comment, offers through a broker or dealer, at the then current market price, in the ordinary course of business and without solicitation of any order to sell on the part of the offeror or broker or dealer. SEC Release No. 34–16385, 44 Fed.Reg. 70349 (Dec. 6, 1979).

In *S–G Securities, Inc. v. Fuqua Investment Co.,* (D.Mass.1978) 466 F.Supp. 1114, the court found that "a publicly announced intention by the purchaser to acquire a substantial block of the stock of the target company for purposes of acquiring control thereof, and . . . a subsequent rapid acquisition by the purchaser of large blocks of stock through open market and privately negotiated purchases . . . constitute a tender offer for purposes of § 14(d) of the statute." 466 F.Supp. at 1126–27. The publicly announced intention in *S–G Securities, Inc.* consisted of three widely publicized press releases issued by Fuqua Investment Co. The first outlined in detail terms of a proposed tender offer with alternative terms if the target company's board of directors did not give their approval. The second press release disclosed in addition the possibility of an independent buying program. A third press release issued twenty-five days later disclosed that Fuqua Investment Co. had acquired approximately 20% of the target company's stock during the preceding week. It disclosed further that Fuqua Investment Co. intended to acquire operating control of the target company and that additional shares might be acquired in the future. The court quoted *Applied Digital Data Systems, Inc. v. Milgo Electronic Corp.,* (S.D.N.Y.1977) 425 F.Supp. 1145, 1155 (concerning a conventional tender offer):

> [When there has been no public announcement of a proposed offer,] . . . the purposes of the Williams Act would not be materially furthered by applying it to the offeror or the target company. When, however, a public announcement of a proposed offer has been made, the

5. *See* 113 Cong.Rec. 854–56, and *Hearings on S. 510 Before Sub–Comm. on Securities of Senate Comm. on Banking and Currency,* 90th Cong., 1st Sess. at 16, 17, 24–25, and 36 (1967). Senator Williams stated:

> Substantial open market or privately negotiated purchases of shares may . . . relate to shifts in control of which investors should be aware. While some people might say that

> this information should be filed before the securities are acquired, disclosure after the transaction avoids upsetting the free and open auction market where buyer and seller normally do not disclose the extent of their interest and avoid prematurely disclosing the terms of privately negotiated transactions.
113 Cong.Rec. S56 (1967).

very dangers that the Act was intended to guard against came into play, and the application of sections 14(d) and 14(e) is thus appropriate.

466 F.Supp. at 1126. The court distinguished authority against applying 14(d) to open market purchases[6] on the grounds that in none of those cases had the purchases been preceded by any widespread public announcements.

The shareholder pressures in *S–G Securities, Inc.,* are clearly more similar to those of a conventional tender offer than of open market or privately negotiated purchases. A shareholder, being informed of the intent to acquire control and all the details of the proposed tender offer, would rush to sell his shares outright pursuant to the independent buying program rather than undertake the risks of tendering his shares in response to the tender offer sure to follow if the buying program did not succeed. The speed of acquisition particularly demonstrates the similarity to a conventional tender offer.

The facts of the case at bar differ substantially from those in *S–G Securities, Inc..* Unlike the hurry generated by the disclosure of an interest in control and of an impending tender offer, the Schedule 13D contains no spur to sell except the fact of a buyer interested in an extremely large percentage of stock. Shareholders and the brokerage community certainly would be interested in taking advantage of a higher market price generated by the presence in the market of an eager buyer. Yet, the Schedule 13D statements that purchases would be made from time to time depending on market conditions were designed to discourage shareholders from supposing that City Investing Company and GDV, Inc., were willing to pay a premium over the market price in order to acquire the shares immediately. There is nothing to indicate to shareholders that they must sell

quickly or lose the opportunity, inducing hasty, ill–considered decisions. In *S–G Securities, Inc.,* Fuqua Investment Co. acquired 20% of the outstanding shares in a one week period subsequent to the filing of a Schedule 13D. No such rapid accumulation occurred in the present case. Indeed, shortly after the Schedule 13D was filed, Huang was ordered to cease purchasing stock due to the impending recession. In this last regard particularly, the present case sufficiently differs from *S–G Securities, Inc.,* to preclude reliance on its precedent.

The appellees rely on *Strode v. Esmark, Inc, supra,* Fed.Sec.L.Rep. (CCH) ¶ 97,538. The findings in that case disclose substantial differences, however:

Esmark was able, through OPCO [Oppenheimer & Co., a securities broker and market maker in Reliance stock], to solicit and purchase shares of Reliance stock through a procedure which constituted a request or invitation for tenders within the meaning of the Take–Over Act. On the days on which it purchased Reliance stock OPCO generally "led the market" for Reliance stock by having the highest bid for Reliance stock and keeping its bid for Reliance shares at the top of the list of market makers appearing on the CRT on the vast majority of the days on which it purchased Reliance stock. Such a bidding strategy operated as a signal to the marketplace that OPCO was continuously interested in purchasing Reliance stock, and constituted a continuing invitation to purchase shares. This strategy was often accompanied by telephone calls in an effort to obtain stock; in this regard, OPCO contacted other brokerage firms, and institutional holders of Reliance shares, all market makers in Reliance stock, and indicated that it would have a continuing interest in the purchase of a

**6.** *Kennecott Copper Corp. v. Curtiss–Wright Corp.,* (2d Cir. 1978) 584 F.2d 1195; *Financial General Bankshares v. Lance,* [Current Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,403 at 93,429 (D.D.C. Apr. 27, 1978); *D–Z Investment Co. v. Holloway* [1974–75 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 94,771 at 96,562–63 (S.D.

N.Y. Aug. 23, 1974); *Nachman Corp. v. Halfred, Inc.,* Fed.Sec.L.Rep. (CCH) ¶ 94,455 at 95,592; *Water & Wall Associates Inc. v. American Consumers Indus., Inc.* [1973 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,943 at 93,-759 (D.N.J. Apr. 19, 1973).

significant or substantial amount of shares and requested that if any of these parties were able to obtain Reliance shares OPCO would like them to offer those shares to it first.

Esmark thus offered a premium in effect, and engaged in active solicitation through OPCO. The court also found that Esmark continued acquiring stock by this means subsequent to the filing of a Schedule 13D and several amendments in which the disclosed purpose of the transactions was acquisition of Reliance.

*Chromalloy American Corporation v. Sun Chemical Corporation*, (E.D.Mo.1979) 474 F.Supp. 1341, offers a more productive comparison. In that case, one Alexander, chief executive officer and principal shareholder in Sun Chemical Corporation, initiated a buying program directed at acquiring Chromalloy through a brokerage firm, involving the steady purchase of a percentage of the daily volume, with no solicitations, no premiums and no off–market transactions. He publicly announced his desire for a seat on the board and his failure to acquire it. A required statement in connection with a public offering of Sun Chemical Corporation debentures, of which he was principal shareholder, stated that part of the proceeds were intended for the purchase of Chromalloy's stock. Sun Chemical Corporation filed a Schedule 13D after acquiring 5% of Chromalloy shares, stating an investment purpose, an intent to acquire additional shares depending on market conditions, and the failure of Alexander to procure a seat on the board of directors. Two amendments to the Schedule 13D were filed, one disclosing a further refusal of a directorship, and the other reiterating the disclaimer of control purpose. A third amendment disclosed an intent to acquire sufficient shares of Chromalloy stock to permit use of the equity method of accounting, which is generally used where there is 20% ownership. A block purchase through Sun Chemical Corporation's broker of 331,200 shares held by institutional sellers was disclosed. A fifth amendment to the Schedule 13D

disclosed another issue of forty million dollars worth of Sun Chemical Corporation debentures, the proceeds of which were to be used principally for the purchase of Chromalloy stock. The amendment further disclosed the filing of suit by Chromalloy with all of the particulars set out and denied. The court found that while the plaintiffs had demonstrated probable success on the merits of their Section 13(d) claim, "there is no way defendants' purchases could be considered a tender offer within the meaning of any of these statutes [alleged violations of Williams Act, Missouri Take–Over Bid Disclosure Act, § 409.500 et seq. R.S.Mo. (1975) and Delaware General Corporation Law § 203]."

The facts in the present case pale in comparison with those in *Chromalloy*. To the same degree, the findings of that court have the greater application here: accepting even the broadest definition of tender offer as correct, the actions of City Investing Company and GDV, Inc. do not meet that definition. Of the eight factors listed by the Securities Exchange Commission, only one is clearly present. The number of shares in which City Investing Company and GDV, Inc., expressed an interest constituted a substantial percentage of the outstanding shares of Stokely–VanCamp, Inc. The appellees argue and the commissioner found that the disclosure of this interest in the Schedule 13D was expected to and did have the same effect as a solicitation. Such a solicitation can at the most be characterized as passive and indirect. It is certainly not equivalent to active solicitation such as occurred in *Wellman v. Dickinson, supra*, or *Strode v. Esmark, Inc., supra*. That in response, brokers independently might choose to solicit stock in order to form blocks to offer for sale has been rejected as a circumstance transforming an announcement into a tender offer. *Brascan Ltd. v. Edper Equities Ltd., supra*, 477 F.Supp. at 789–90. No premium was offered for Stokely–VanCamp, Inc., shares. It might be argued that the equivalent is offered by a natural rise in the market price, generated by the

presence in the market of an eager buyer.[7] Yet the Schedule 13D statements were designed to discourage expectations that City Investing Company and GDV, Inc., were willing to pay a premium over market price for Stokely–VanCamp, Inc., shares, and, although there were a few transactions during the twenty–day interval between the filing of the Schedule 13D and the Commissioner's first order, the Schedule 13D in fact had no particular effect on the market price of Stokely–VanCamp, Inc. stock. The Schedule 13D did not offer fixed rather than negotiable terms. Because it did not purport to be an offer, no terms were discussed at all, nor was there any indication of what the terms were likely to be, unlike the case in *S–G Securities, Inc., supra.* Clearly, potential sellers were at liberty to bargain. The Schedule 13D imposed no contingency on the receipt of a fixed number of shares, although it stated that City Investing Company and GDV, Inc., might choose not to acquire any more stock. The open market and privately negotiated purchases contemplated by the Schedule 13D are final when made thus entailing no risk that "tendered" shares might ultimately be returned. The appellees argue that the stated limit on the number of shares desired in the schedule 13D is in effect a time limit within which shareholders must offer to sell, since the market price would return to normal levels once City Investing Company and GDV, Inc., ceased purchasing shares. However, nothing in the Schedule 13D suggests the period of time in which those companies expected to acquire those shares or that they would like to acquire them quickly. Rather, it demonstrates their wish to avoid a rapid accumulation and its attendant effect on the market price. Purchases were to be made from time to time depending on market conditions.[8] The facts of this case disclose no pressures on

shareholders to sell other than those previously discussed. Finally, as we previously noted, the Schedule 13D in this case did not precede or accompany a rapid accumulation.

Were we to rule that any publication of an interest in acquiring a substantial percentage of a company's stock, no matter how cautious or equivocal, is equivalent to a tender offer, we would hold that the Williams Act, by operation of Section 13(d), prohibits any such acquisition unless accomplished in compliance with the provisions of Section 14(d). No authority supports such a result. We perceive nothing in the Schedule 13(d) disclosure imposing such extraordinary pressures on the shareholders of Stokely ·VanCamp, Inc., that Section 13(d) of the Williams Act is not sufficient protection. If the appellants misrepresented their interest in acquiring control, the appropriate remedy would be a Section 13D action. *See, e. g., Jewelcor Incorporated v. Pearlman,* (S.D.N.Y.1975) 397 F.Supp. 221; as well as *Chromalloy, supra.* If selling shareholders sold at unfairly depressed prices due to the misrepresentation, they may bring actions for damages. *See Rondeau v. Mosinee Paper Corp.,* (1975) 422 U.S. 49, 60, 95 S.Ct. 2069, 2077, 45 L.Ed.2d 12. Whatever the proper definition of "tender offer", there is no need demonstrated in this case to expand the application of Section 14(d) into these areas.

Because, on the basis of the facts found by the Commissioner, he ·could not have reasonably found a tender offer had been made, the Commissioner erred in concluding that the actions of City Investing Company and GDV, Inc., constituted a takeover offer within the meaning of the Indiana Act.

## II.

■ The appellants challenge the Commissioner's finding of a violation of Section

---

7. See footnote 6.

8. Similar market impact arguments have been rejected in *Nachman Corp. v. Halfred, Inc.,* and *Water & Wall Associates Inc. v. American Consumers Indus., Inc., supra* n. 4, in which cases there were no public announcements. In support it is suggested in Einhorn and Blackburn, *The Developing Concept of "Tender Offer",* 23

N.Y.L.S.L.Rev. 379 (1978), that the shareholder pressures are no different than in all market transactions and require no investment decisions as are presented by a tender offer. Because the Schedule 13D disclaimed a present intent to acquire control, the same may be said in the present case.

12 of the Securities Regulation Act, IC 1976, 23–2–1–1 et seq., 23–2–1–12 as contrary to law and unsupported by substantial evidence. They contest the application of the Act, point out the contradictory appearance of the Commissioner's ultimate findings of fact, and note the inexplicitness of the order.[9] The Commissioner's findings in support of his conclusion are that three statements in the Schedule 13D were false. The first of these is that the purchases and proposed purchases of stock were for investment purposes. The second is the statement of a concurrent intent to acquire between 15–20% of Stokely–VanCamp, Inc. stock. The third states:

> While neither GDV nor City currently intends to seek representation on the Board of Directors of the Company or otherwise to seek to exercise control over the Company, they may, depending on circumstances existing in the future, seek to acquire sufficient additional shares of Common Stock so that they can exercise control over the Company.

The Commissioner found the disclaimer of a current intent to seek to exercise control was false. With regard to the second statement, the Commissioner stated that he gave great weight to evidence of the telephone call between Delehanty and Scharffenberger in which Scharffenberger stated that City Investing Company and GDV, Inc., did not have the cash to purchase 20% of Stokely–VanCamp, Inc.'s, stock and that they might buy from seven to eight percent.

In light of the Commissioner's finding that the present management of Stokely–Vancamp, Inc., owns approximately twelve percent of the company's stock, we do not perceive how the appellants could entertain a *current* intent to seek to exercise control and at the same time intend to purchase no more than a percentage markedly short of that owned by the incumbent management. If the Commissioner meant that the appellants were interested in acquiring Stokely–

VanCamp, Inc., and meant to do so *if, in the future,* they had the means to purchase a controlling interest, this is what the Schedule 13D states. The conditional language used must perforce be accurate if the appellants had no current capability to purchase more than eight percent.

■■ Self–contradictory inferences cannot be said to be reasonably drawn from the evidence, nor can they reasonably support a conclusion of law. This, together with the nature of the Commissioner's order, compels us to conclude that the order must be set aside. *Petition of McDonald,* (1961) 241 Ind. 239, 171 N.E.2d 691; *Hatcher v. Smith,* (1972) 152 Ind.App. 299, 283 N.E.2d 582. When reviewing an administrative order, we are bound to accept the facts as found by the agency if supported by the evidence. *Mishawaka v. Stewart,* (1974) 261 Ind. 670, 310 N.E.2d 65, 69. In the absence of specific findings, we cannot surmise that the agency found facts necessary to support its order, *Wabash Valley Coach Co. v. Arrow Coach Lines,* (1950) 228 Ind. 609, 94 N.E.2d 753, nor can we direct an agency to amend or change its findings, *Braschler v. Review Board,* (1950) 120 Ind.App. 294, 90 N.E.2d 362, for the reason that we have no power to decide a matter on the merits in place of the agency. *Public Service Commission v. Chicago, I. & L. Ry. Co.,* (1956) 235 Ind. 394, 134 N.E.2d 53. We have no power to affirm the result reached by drawing from the evidence inferences of our own directly counter to those drawn by the agency. *Indiana Board of Pharmacy v. Horner,* (1961) 241 Ind. 326, 172 N.E.2d 62, 66.

We reverse.

CHIPMAN and MILLER, JJ., concur.

---

**9.** The order enjoins further acquisition of shares until compliance with the Securities Regulation Act inclusively. Since, apart from the anti–fraud provisions, that Act deals exclusively with registration of Securities and of broker–dealers, this order is meaningless and unenforceable. *See Railroad Yardmasters of North America v. Indiana Harbor Belt R. Co.,* (7th Cir. 1948) 166 F.2d 326, 330.